The opinion of the court was delivered by
Breaux, J.
This suit'is brought by the widow of Frederick Hot-tinger against her children for the partition of the community property. In the partition proceedings the widow claimed that the expense for graveling the street in front of the property paid by her during her usufruct be allowed her, and that some of the heirs be ordered to collate money alleged to have been advanced them; demands for collection were also advanced by some of the heirs against their coheirs ; it was claimed besides that one of the heirs should pay rent for community property occupied by him; and there was a demand by one of the heirs for compensation for services rendered by her to her deceased father. The judgment of the lower court directing the partition rejected the plaintiff’s demand for the graveling expense paid by her; decreed collations by two of the heirs, and that one of them should pay rent for his occupancy of the community property, and rejected the demand of the heir claiming compensation for personal services to her father. From this judgment decreeing the partition and disposing of the claims of the widow against the heirs and of the heirs against their coheirs, there is but one appeal, that of Frederick Hottinger, who complains only of the judgment against him for collation of money and for rent of the community property.
There are answers to the appeal by the widow and some of the heirs praying for an increase of the judgment against the appellant. The answers ask besides that the judgments as between the appellees be changed. Thus the widow taking no appeal asks that she be allowed the money she paid for graveling the street; Mrs. Langenstein, the heir claiming for services rendered her father, asks that her demand be allowed. Others of the heirs, without appealing, ask that collations be decreed against their coheirs, and *1635 the widow and some of the heirs pray that the designation by the lower court of the auctioneer to make the partition sale be changed' The appeal of Frederick Hottinger submits the question of the collation required of him, and whether he is liable for rent, and the •answers to his appeal are competent to demand that liability in both respects be increased. In all other respects it is manifest the answers seek to change the judgment as between the appellees. It is claimed that the right to such changes is conferred by Art. 887 of the Code of Practice, but this article entitling the appellee without appealing to ask by his answer a change in the judgment is limited to those modifications that affect only the appellant, and does not authorize any changes in the judgment as between appellees. It results we can deal with the issue between the appellant and the appellees, but in other respects the judgment of the lower court must remain undisturbed. Fields vs. His Creditors, 11 An. 545; Converse vs. Steamer Lucy Robinson, 15 An. 433; Lallande vs. McRae, 16 An. 193; Berthelot vs. Fitch, 44 An. 504.
In aid of the demand that the appellant, Frederick Hottinger, shall pay the rent of property of the community, it is shown that his occupancy was for the years 1874, 1875 and 1876, accompanied by proof of the rental value. On the other hand, we think it proved •that the agreement between Frederick Hottinger, the father, and his son was that he was to pay taxes and make necessary repairs to be in full compensation for his occupancy. The property consisted of two tenements under one roof, singly assessed for taxes. The contention of the son is that occupying but one of the tenements he should pay but half the taxes. If a division of taxes had been intended we think it would have been expressed. As we appreciate the agreement, he is bound for the taxes on the whole property, a conclusion we more readily accept under the proof that these taxes, are about, if not not less than a fair rent, and this was the view of the lower court.
The contention has been earnest as to the amount Frederick Hot-tinger received from his father. Our view in reference to the discharge from all liability, whatever the amount, makes unnecessary a detailed examination of the conflicting testimony as to this amount. In the testimony of the son there is the positive statement, all he received was five hundred and fifty dollars. He managed his father’s business, that of a dairy, sold the milk, received the money, paid *1636 taxes and made the disbursements necessary for conducting the business. He testifies, in effect, it was by his savings he accumulated the five hundred and fifty dollars he received. He knew the extent of the accumulations, and if truthfuj, his testimony is conclusive. The testimony of the mother is that he received nine hundred and fifty dollars, and at one time it is sensibly weakened by her state ■ ment, on cross-examination, that four hundred and fifty dollars of the amount was taken by her or by him from her armoir, and five hundred dollars he received from her son-in-law. The danghter’s testimony to the giving of the money is, we think, reduced by cross-examination to her witnessing the counting of four hundred and ninety dollars, but that she did not see the money given. We have too, from some of the heirs, testimony of the verbal admissions of Frederick Hottinger of the money he received. The remembrance of the perfectly honest witness of what another has said in reference to a disputed liability may not be accurate, and when the testifying witnesses are parties to a heated controversy in relation to the asserted liability, and interested in maintaining that liability claimed to have been admitted, there is reason to receive with caution such testimony of admissions. It is impressive, too, on this branch of the case, that years ago, soon after the father’s death, the collation to be made by Frederick Hottinger was the subject of controversy, on oppositions by the heirs to the mother’s account as administratrix of the succession of her husband. It is reasonable to suppose the amount Frederick Hottinger had received was then known to the heirs judicially asserting that amount. In the opposition to the account then filed by some of the heirs, it was alleged he received five hundred and fifty dollars; the same amount he now testifies was all he received. In the condition of the proof we would not feel at liberty to reject his positive testimony, but all discussion on this point is subordinated to the other issue as to the discharge from all liability he asserts, and which we now propose to examine.
It is in proof that the son, Frederick R. Hottinger, for years after his majority before his father’s death rendered services to which we have already alluded, in conducting the dairy. There was, undoubtedly, a basis for compensation for such services. The son testifies that in 1874, when he left his father’s house to be married, there was a settlement by which he was authorized to retain the five hun *1637 dred and fifty dollars he had received. He produces a paper bearing date November 17, 1874, addressed to Father Bueargart, reading: “I, the undersigned, the father of F. R. Hottinger, have settled all claims between us both and 1 hereby give my consent that he may have what money he has in full settlement. Signed, yours respectfully, F. Hottinger.” On the right of this paper is what seems to be five dollars and fifty cents crossed by lines drawn through the figures, and on the left are figures claimed on one side to be five hundred and fifty dollars, and by the widow and heirs it is insisted that it is eight hundred and fifty dollars. The testimony is that the five dollars and fifty cents was placed on the paper by F. Hottinger when he signed the paper in 1874. Underneath this certificate of settlement is written in German a note to the priest requesting him to call on the writer in the evening, and this is signed Vater F. Hot-tinger. Vater is the German for father, and this addressing the priest is, we gather, in accordance with a custom observed when the son leaves the father’s house. The son, testifying both signatures are his father’s, states the certificate is in his hand, and he further testifies he was given the paper to take to the priest.
If this paper is not a forgery, with the son’s testimony it establishes his discharge from the liability asserted against him. The gravity of the imputation incident to a decision against the validity of the paper has not escaped our careful consideration of the issue. It is impressive that there has been no attempt by expert testimony to impeach the signature to the certificate, nor any testimony on the point save that of the son, distant and positive on the subject, unless weakened by his cross-examination.
Our attention is directed to that part of the cross-examination in which, after the sworn testimony to the signature,-he is asked: “Which is your signature here. Yours respectfully, F. Hottinger, or the last one?” The answer is: “ Yes sir, that German signature is father’s.” This is followed by the question: “ And this heading, Father Bueargart, was put there, and you were given it to go to the father; is that right?” To which the witness answers, “Yes.” And again to the question, “ This has been offered by you?” the witness answers, “Yes.” It is claimed that in this portion of the testimony the son admits he and not his father signed the paper. This cross-examination following quickly the witness’ explicit statements both signatures to the paper were his father’s, suggests that if *1638 a forgery was designed, the witness would have been careful not to put his statement and its succeeding contradiction in such marked juxtaposition. When the cross-examination had brought the witness in this apparent opposition to his previous statement, there was an interposition of counsel with the protest “ that is no way to examine the witness; show him the paper.” And the witness then renewed the statement, both signatures were his father’s. We do not feel at liberty to hold the paper a forgery, on an implication based on an answer that may naturally be attributable to inadvertence and corrected by the witness on his re-examination. Again, it is claimed there is a patent similarity between the signature— Vater P. Hottinger conceded to be genuine and P. Hottinger to the certificate of settlement. Usually, when forgery is the issue, the testimony of those familiar with the handwriting of the party is produced, and such testimony would be quite effective if, in this case, there was the variance between the signatures marked as claimed in the briefs. In the absence of any evidence assailing, and with the positive testimony sustaining the signature, we would have great difficulty in founding the conclusion of forgery merely on our impression derived from an inspection of the signatures, especially when our examination fails to detect the alleged variance. It is our opinion the paper stands proved.
It is claimed on another ground that the paper is void, that is altered. It is incontestably proved that the son of F. R. Hottinger crossed the 5.50 and placed the figures on the right of the paper. His statement is that looking over the paper with his mother a short time previous to the trial he crossed the §5.50 and placed the figures intended to be $550 on the left, and that he did this to make the paper conform to the sum his father had received. The suggestion that P. R. Hottinger added the $5.50 is opposed to his own testimony as well as that of his son, who drew the lines across the 5.50 already on the paper. It is difficult to conceive any motive for P. R. Hottinger to add 5.50 to a paper expressing his full discharge for all the money he had received. The suggestion he added the $5.50 is based on his cross- examination. He had testified that his father had written the 5.50 in 1874 when he signed the paper, and that Hottinger, Jr., had added the left-hand figures about a month previous. On the cross-examination the witness was asked, “Did you not say these figures were put there a month ago?” he answers yes, and then follows the question, *1639 “There were no figures there previous?” elicting no. This part of the testimony it is claimed is inconsistent with his statement that his father placed the §5.50 on the paper. The form of the question was well calculated to direct the witness’ attention to the left-hand figures, and his answer if understood to refer to those figures is consistent. Those figures he had stated had been added a month previous, not the right-hand figures placed there, he testified, twenty years before — i. e., 1874.
Our attention is also directed on this question of alteration to the testimony of F. R. Hottinger that the $6.50 was written with the same pen and ink. The trial judge looking through the microscope observed that the figures did not seem to bear out that statement. Thereupon, the witness using the microscope stated he would now say not the same ink, but the same pen. The issue was whether the witness’ father had placed the figures on the paper, and to this the witness had testified. Any witness, it seems to us, testifying to a paper made more than twenty years before, might be mistaken as to the details of the pen and ink used without discrediting his statement to the main fact under investigation. Because mistaken as to the pen and ink we can not infer that therefore the witness added the 5.60 and not his father as he testifies. Here again the absence of any motive for the sonto add the 5.50 confronts us. The paper without any addition expressed the discharge. The probability harmonizes with the witness’ testimony that the apposition of the 5.50 was the father’s act, and hence there is no basis to impute to the witness any alteration in this x-espect.
There remains the question of the effect of the additions to the-paper by the son of the witness, F. Hottinger, Jr. His explanation, accompanied with the statement he did not know of this suit when he crossed the five dollars and fifty cents and added the figures on the right, is commented upon as improbable, but the controlling question is the effect of the changes he made, whatever his knowledge. If this paper was before us expressing, as it does, a discharge of F. R. Hottinger from liability for the money he had received, it would not detract from that discharge to find five dollars and fifty cents at the foot. That insignificant sum we would readily interpret to refer to the five hundred and fifty dollars, the amount the son testified he received. No discharge would have been sought, least of all formally granted, if all the son had received was five and a. *1640 half dollars. The paper fully proved granting the discharge, or, to use its own language, expressing a full settlement of all claims between the son and the father, and the father’s consent that the son may have what money he has, in full settlement, would have been construed to refer to the money the son had received, as shown by the testimony, ñve hundred and fifty dollars and five dollars and fifty cents, would be deemed an error intended to mean five hundred and fifty dollars. The lines drawn through the 5.60, if not detracting from the paper, added no force to it. Without any crossing the rational interpretation would have read five hundred and fifty dollars, as intended by the father. The testimony as to the figures on the left is they were designed to represent $550. The witness who put them there knew that five hundred and fifty dollars was the sum his father claimed to have received. Naturally he would have placed that sum on the paper, not eight hundred and fifty dollars. There was no reason for the apposition of eight hundred and fifty dollars. It would tend to conflict with his father’s testimony. When, therefore, the witness who wrote the figures testifies he intended five hundred and fifty dollars, consistent as it is with probability, it seems to us we must accept the testimony. In this view the changes on the paper made by Hottinger, Jr., were of an immaterial character. We have had on this branch of the case an elaborate citation of authority as to the effect of alterations in written instruments offered in evidence, but the result of all authority is to affirm the principle in the text-book, i. e., the alteration must be material, “ that causes the writing to speak a language different in legal effect from that it originally spoke.” 1 Greenleaf on Evidence, Secs. 567, 568. While deprecating any changes in writing to be used in evidence, we find no basis either in the motive that prompted the changes in the paper or in their effect, to annul a paper fully proved, and which without the changes would be equally, if not more effective, to show the settlement and discharge of F. R. Hottinger from liability for the collation demanded.
It is therefore ordered, adjudged and decreed that the judgment of the lower court be avoided and reversed in so far as it condemns F. R. Hottinger to collate five hundred and fifty dollars, and in all other respects be affirmed at appellee’s cost.
The Ohief Justice takes no part in this decision, as he was not present when the case was argued.